# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **MOBILE BAYKEEPER, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 14-0032-WS-M** |
| | ) |
| **U.S. ARMY CORPS OF ENGINEERS,** | ) |
| *et al.,* | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **PLAINS SOUTHCAP INC.,** | ) |
| | ) |
| **Intervenor-Defendant.** | ) |

## ORDER

This matter comes before the Court on a series of interlocking cross-motions for summary judgment, including the following: Plaintiff's Motion for Summary Judgment (doc. 38), the Cross-Motion for Summary Judgment (doc. 43) filed by the U.S. Army Corps of Engineers, Lt. General Thomas P. Bostick and Col. Jon J. Chytka, and the Motion for Summary Judgment (doc. 45) filed by intervenor-defendant Plains Southcap Inc. All three Motions have been extensively briefed and are now ripe for disposition.

## I. Nature of the Case.

This action arises from Plains Southcap's construction of a 24-inch crude oil pipeline over a span of 41 miles, from the Ten-Mile Terminal, located approximately 11 miles northwest of downtown Mobile, Alabama, extending southwest to the Chevron Refinery in Pascagoula, Mississippi, approximately one mile from the Gulf of Mexico. An 18-mile portion of that pipeline project was to be built in Mobile County, Alabama.[1] That portion of the pipeline project was designed to traverse the Big Creek Lake watershed, and to include multiple crossings of

---

[1] The Mississippi section of the Plains Southcap pipeline project is beyond the scope of this litigation, and will not be addressed herein.

Hamilton Creek, a major tributary of Big Creek Lake.[2]  In January 2013, the U.S. Army Corps of Engineers (the "Corps") issued 14 verifications for the Alabama portion of the pipeline, thereby verifying that Nationwide Permit 12 ("NWP 12") applied to those proposed discharges of dredged and fill material, and authorizing construction to proceed under the Clean Water Act ("CWA").  Later that year, Plains Southcap began constructing the pipeline in the Big Creek Lake watershed.

On January 24, 2014, plaintiff, Mobile Baykeeper, Inc. ("Baykeeper"), commenced this action against the Corps and two of its officials, Lt. General Thomas P. Bostick and Col. Jon J. Chytka (collectively, the "Corps Defendants").  Baykeeper alleged that the Corps' verification of the pipeline project routing through the Big Creek Lake – Hamilton Creek watershed violated the CWA, the Administrative Procedure Act ("APA"), and applicable rules and regulations because (i) the Corps failed to consider General Condition 7, relating to proximity to public water supply intakes; (ii) the Corps failed to consider the cumulative impacts of the pipeline route in this watershed; and (iii) the Corps failed to consider whether routing the pipeline through the watershed would be contrary to the public interest.  (Doc. 1, ¶¶ 50-68.)  On that basis, Baykeeper requested that the Court declare the Corps' verifications of the Alabama segment of the pipeline under NWP 12 to be null and void, enjoin Plains Southcap from conducting any activities in reliance on those verifications, and enjoin the construction and operation of the pipeline until the Corps Defendants comply with the CWA and the APA.  Plaintiff did not seek a temporary restraining order or preliminary injunction.  On February 13, 2014, the Court entered an Order (doc. 15) granting Plains Southcap's motion to intervene as a party defendant.

Now, all parties have moved for summary judgment on this matter in its entirety.

## II.    Relevant Factual Background.

### A.    The Pre-Construction Notification.

On September 12, 2012, Plains Southcap caused to be submitted to the Corps a pre-construction notification ("PCN") for the Alabama portion of the pipeline, whereby it requested

---

[2]    Documents in the administrative record confirm that Plains Southcap's project design was that "[t]he 50-foot wide pipeline corridor will require 22 stream crossings. … The corridor will cross Big Creek (4 times), Double Branch (1), Hamilton Creek (8 times), Pierce Creek (5 times), Red Creek (1), Wolf Branch (2), and Seabury Creek (1) at numerous locations." (AR 979.)

authorization under NWP 12 to construct the project.  (AR 2-3.)[3]  The PCN (which included

maps showing the proposed pipeline locations, as well as adjacent wetlands, streams, and other

topographic features) explained that construction of the pipeline would be within a 75-foot right-

of-way, and would consist of clearing vegetation, excavating a trench, laying the pipe, replacing

soil, adjusting topography, and re-establishing vegetation, with a permanent 50-foot easement.

(AR 4.)  Plains Southcap notified the Corps of its environmental consultants' opinion that

"[b]ased on our regulatory analysis, the proposed project could be constructed under the

conditions of NWP 12 with submittal of a PCN."  (AR 61.)

## B.     The January 2013 Verifications.

After several months of back-and-forth discussions and supplementation of information

by Plains Southcap (including detailed documentation concerning topics such as impacts on

gopher tortoises, bald eagles and sites containing cultural artifacts), the Corps issued a "Decision

Document" for the Alabama pipeline PCN on January 17, 2013.  The Decision Document noted

that the project "will require temporary trenching of 22 stream crossings, impacting 389 linear

feet of stream bottoms, and the mechanized land-clearing, temporary trenching and side-casting

of fill, and temporary and permanent conversion of bottomland hardwood wetlands to shrub-

scrub and emergent wetlands within 40.42 acres of wetlands located within 107 wetland

polygons along the pipeline corridor in Alabama."  (AR 1005.)  It further observed that "[a]ll

wetland and stream impacts are temporary except for the permanent conversion of forested

wetlands to non-forested wetlands."  (AR 1005-06.)

The Decision Document issued verification for the project under NWP 12, subject to

certain enumerated conditions.  One such condition provided that "[m]aterial resulting from

trench excavation may be temporarily side cast into waters of the United States for no more than

three months, and must be placed and stabilized in such a manner that it will not be dispersed by

currents or other forces."  (AR 1007.)  Another condition obligated Plains Southcap to purchase

25.92 bottomland hardwood wetland mitigation credits from an approved Alabama wetland

mitigation bank.  (AR 1008.)  The Corps further required Plains Southcap to restore all

---

[3]        The complete Administrative Record, totaling more than 1,000 pages, is found in
the court file at document 29.  The pages in that record have been Bates stamped, and are cited
herein using those Bates-stamped numbers, with the citation form "AR _____."

temporary impacts to waters of the United States to their pre-impact elevation, contours and ecological condition, except where otherwise noted, with annual monitoring reports to be submitted for a period of five years.  (*Id.*)  Plains Southcap was forbidden from disposing of trees, brush or other debris in any stream corridor, wetland or surface water, and was likewise barred from discharging sewage, oil, refuse or other pollutants into the watercourse.  (AR 1009.)

The Decision Document, which was authored by Corps Team Leader Michael B. Moxey, concluded as follows:  "I have reviewed the proposed project and determined that the work will result in minimal individual and cumulative adverse effects on the aquatic environment."  (AR 1011.)  Also in that Decision Document, Moxey certified that "[t]his project complies with all terms and conditions of the NWP's including any applicable Regional Conditions."  (*Id.*)

On January 18, 2013, the Corps sent a letter to Plains Southcap, verifying that the Alabama portion of the pipeline is authorized by NWP 12 and providing 14 separate NWP 12 verifications (each one covering all impacts and crossings over a waterbody and adjacent wetlands at a single location).  (AR 1012-16.)  Those verifications were to remain valid for two years and were subject to all terms and conditions associated with NWP 12, as well as certain special conditions enumerated by the Corps.[4]

As verified by the Corps, the Plains Southcap project called for the pipeline to be constructed at distances of less than one mile from Big Creek Lake, the public drinking water supply for approximately 200,000 people in the Mobile area.  (Sackett Aff. (doc. 32-1), ¶ 11 & Exh. A.)  The pipeline would also pass within approximately two miles of the S. Palmer Gaillard Pumping Station, the public water supply intake on Big Creek Lake.  (*Id.*, ¶ 10 & Exh. A.)  And the pipeline would cross Hamilton Creek, a tributary of Big Creek Lake, multiple times during its routing through lower Alabama.  (AR 1020-21.)  Although the Administrative Record is voluminous, all parties concur that it lacks any showing that the Corps considered the proximity of the pipeline to the public water supply intake in issuing the NWP 12 verifications.  There is likewise no dispute that the Corps neglected to make any determination that allowing the

---

[4]     In particular, the Corps' January 18 letter to Plains Southcap was clear that "[y]ou must comply with all of the regional and general conditions and any project specific conditions of these verifications or you may be subject to enforcement action."  (AR 1013.)  The burden of compliance was thus squarely placed on Plains Southcap, on pain of an enforcement action.

pipeline to pass so close to the public water supply intake would serve the public interest. Such concerns lie at the core of Baykeeper's lawsuit.

### C. Post-January 2013 Modifications to the Project.

On February 10, 2014 (barely two weeks after Baykeeper filed suit), Plains Southcap notified the Corps in writing that it had modified the pipeline design to utilize horizontal directional drilling ("HDD") techniques for certain stream crossings in the Hamilton Creek watershed. (Doc. 34-1, at 1-2.) Plains Southcap explained that these modifications were being implemented to "minimize any adverse impacts from construction." (*Id.* at 2.) On that basis, Plains Southcap requested re-verification from the Corps "that the Project is authorized under NWP 12, in light of these new efforts to further minimize impacts in the area of the Hamilton Creek watershed." (*Id.*) On February 28, 2014, the Corps responded to Plains Southcap that "[a] Department of the Army permit is not required for the proposed underground directional drilling if there is no associated discharge of dredge or fill material into wetlands and streams. Your previous authorization under Nationwide 12 for the remainder of the crossings remains in effect …." (Doc. 34-2, at 1.)[5]

It is undisputed, however, that even with the aforementioned modifications, "some permitted activities in the Hamilton Creek watershed remain." (Doc. 43, at 11.) The Corps acknowledges that when Plains Southcap excavated trenches for the pipeline that crossed wetlands, the associated removal of vegetation and temporary discharge of dredged or fill material into wetlands was subject to the Corps' regulatory authority under § 404 of the CWA. (*Id.* at 11-12.) Likewise, Plains Southcap characterizes its modifications to the project as "eliminat[ing] most of the ground level stream crossings" (doc. 46, at 11), not all of them. Certainly, defendants have not offered evidence – and the record does not unequivocally establish – that no stream crossings within the Hamilton Creek watershed were ultimately performed using the traditional trench excavation techniques (producing discharges of dredged and fill material in waterways), as opposed to HDD techniques (producing no such discharges). Reasonable inferences from the record, and from defendants' own statements, are to the contrary.

---

[5]     This statement is consistent with the Corps' previous representations. Indeed, in an e-mail dated November 28, 2012, a Corps representative explained to Plains Southcap that "directional drilling where there are no impacts to 404 wetlands or streams (complete avoidance) is a non-regulated activity." (AR 876.)

At any rate, the Alabama portion of the pipeline project has been completed and the pipeline is now operational.  (Lee Aff. (doc. 45-2), ¶ 2 ("Plains Southcap has constructed and now operates and approximately 41 mile long interstate pipeline that transports crude oil ….").)  Plains Southcap shows that construction of the Alabama portion of the pipeline commenced in March 2013, and was completed in March 2014, some two months after Baykeeper initiated this lawsuit.  (*Id.*, ¶ 4.)

## III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Here, all parties have moved for summary judgment on all claims, in accordance with a special scheduling order that the parties jointly proposed.[6]  The law is clear that "[t]he applicable

---

[6]    On April 23, 2014, the parties jointly filed a document requesting relief from the Preliminary Scheduling Order and stating that "[t]he parties anticipate that Plaintiff's claims will be resolved on cross-motions for summary judgment on the basis of the AR."  (Doc. 28, at 2.)  This Court granted the joint motion and entered a comprehensive briefing schedule governing the anticipated cross-motions for summary judgment, in accordance with the parties' request. (Continued)

Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Smith v. Seaport Marine, Inc.*, 981 F. Supp.2d 1188, 1193 (S.D. Ala. 2013) (citations omitted). Indeed, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). That said, it is also recognized that "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Smith*, 981 F. Supp.2d at 1193 (citations omitted). Such is the case here.

## IV. Analysis.

### A. Defendants' Preliminary Objections to Baykeeper's Claims.

Antecedent to reaching the merits of whether the Corps' verification decisions as to the Alabama portion of the Plains Southcap pipeline were in conformity with the CWA, the APA and the Corps' own rules, the Court pauses to address preliminary objections interposed by one or more defendants relating to Baykeeper's legal ability to maintain this action.

#### 1. Standing.

As an initial matter, Plains Southcap challenges whether Baykeeper can satisfy the jurisdictional prerequisite of standing. "In order to establish that it has constitutional standing to bring a suit: a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Florida Wildlife Federation, Inc. v. South Florida Water Management Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) (citations omitted). "These requirements are the irreducible minimum required by the Constitution for a plaintiff to proceed in federal court." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013) (citations omitted). Plains Southcap's position is that Baykeeper cannot meet the first and third elements.

---

(*See* doc. 30.) That approach allowed for the orderly, efficient briefing of all three competing Rule 56 Motions, with a minimum of overlap and duplication and each party being granted a full and fair opportunity to be heard on the relative merits of its own and each other's summary judgment arguments.

With regard to the "injury in fact" requirement, binding authority teaches that "[a]n injury in fact cannot be an abstract injury," but must instead involve "some type of cognizable harm, whether such harm is physical, economic, reputational, contractual, or even aesthetic." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004). Moreover, for a plaintiff (such as Baykeeper) seeking only injunctive and declaratory relief, this element requires proof of "not only an injury, but also a real and immediate threat of future injury in order to satisfy the injury in fact requirement." *Id.* (citation and internal quotation marks omitted); *see also Houston*, 733 F.3d at 1329. Plains Southcap posits that Baykeeper's members' fear of a breach to the pipeline causing spilled oil to reach Big Creek Lake is too contingent and speculative to give rise to standing.

Plains Southcap's objection is unpersuasive for at least two reasons. First, it focuses exclusively on the risk of oil spill, without acknowledging (much less discussing) the various other injuries identified by Baykeeper's members as a means of achieving organizational standing.[7] It is well-settled that "environmental plaintiffs adequately allege injury in fact when they aver they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Sierra Club v. Johnson*, 436 F.3d

_____

[7]      For example, Baykeeper member Thayer Boswell Dodd, who lives, recreates and owns a business in the Big Creek Lake watershed, stated in her declaration that she was "concerned about the consequences of pipeline construction … on the flora and fauna" in the Big Creek Lake area. (Thayer Dodd Decl. (doc. 39, Exh. 3), ¶ 13.) She also stated that pipeline construction activities "will negatively impact native flora and fauna" and that her "personal enjoyment will be diminished by noise, aesthetic blight and traffic from construction." (*Id.*, ¶ 14.) Similarly, Baykeeper member Jeffrey Charles Deuschle, who also lives and routinely recreates in the Big Creek Lake watershed, expressed concern that his "aesthetic interests in Big Creek Lake will be harmed by construction of the Plains Pipeline …. Construction of the Plains Pipeline will harm the watershed by impacting streams and degrading wetlands." (Deuschle Decl. (doc. 39, Exh. 1), ¶ 14.) And Baykeeper's executive director asserted that "[c]onstruction of the Pipeline and maintenance of a permanent right of way will degrade wetlands and impact streams, including Hamilton Creek, in the Big Creek Lake watershed." (Callaway Decl. (doc. 47, Exh. A), ¶ 5.) Of course, it is appropriate to examine the interests of Baykeeper's members in assessing whether Baykeeper itself has standing to sue. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.") (citation omitted).

1269, 1279 (11th Cir. 2006) (citations and internal quotation marks omitted).  Even setting aside the oil spill allegations, Baykeeper has made just such a showing here.  Second, Plains Southcap's argument that Baykeeper has not shown an injury in fact because the risk of an oil spill is speculative is inconsistent with authority recognizing that this requirement may be satisfied in the context of probabilistic and contingent injuries such as the risk of a ruptured pipeline causing an oil spill.  *See, e.g., Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) ("we do not understand the customary rejection of 'speculative' causal links … as ruling out all probabilistic injuries").[8]  For these reasons, the Court does not credit Plains Southcap's assertion that Baykeeper has failed to show the requisite injury in fact to establish Article III standing.

As for redressability, the Court finds that Baykeeper has made a sufficient showing to establish this element of constitutional standing, as well.  That the Alabama portion of the

---

[8]        *See also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) ("Threats or increased risk thus constitutes cognizable harm.  Threatened environmental injury is by nature probabilistic.  And yet other circuits have had no trouble understanding the injurious nature of risk itself."); *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) (where city sued to block construction of radio tower that would increase risk of flooding, "[t]he injury is of course probabilistic, but even a small probability of injury is sufficient to create a case or controversy – to take a suit out of the category of the hypothetical – provided of course that the relief sought would, if granted, reduce the probability"); *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F. Supp.2d 32, 42 (D.D.C. 2006) (finding injury-in-fact requirement satisfied where presence of pipeline near organization member's property created increased risk of leaks which could damage member's property, inasmuch as increased susceptibility to harms is sufficient to satisfy injury requirement). Although Plains Southcap relies on *NO Gas Pipeline v. F.E.R.C.*, 756 F.3d 764 (D.C. Cir. 2014), that case is distinguishable.  In *NO Gas*, three environmental groups sued to stop a natural gas transportation pipeline, alleging an injury in fact based on higher exposure to radon.  The D.C. Circuit shot down this basis for Article III standing, reasoning as follows: "The increased risk to their health is something that may occur if the pipeline or the pipeline suppliers tap into gas that has more radon than the current mix; nothing occurs to alleviate any increased radon in that case; the radon does not become diluted by mixing with other gas; and the radon in fact reaches and permeates their homes." *Id.* at 768.  By contrast, Baykeeper's members have adequately established that they would suffer an injury in fact by any rupture in the oil pipeline along the Big Creek Lake watershed, whether or not anything else happened (*i.e.*, whether spilled oil actually reached the Lake itself or the public water supply intake therein).  This case is thus substantially removed from the far-fetched, repetitious stacking of one highly unlikely contingency atop another until a hypothetical harm is conjured up, as was deemed jurisdictionally inadequate in *NO Gas.*

pipeline has been completed and is now operational does not render Baykeeper's alleged injury incapable of redress. *See, e.g., City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) ("We also hold that petitioners' injuries are redressable in this suit. An agency action that is taken without following the proper environmental review procedures can be set aside by this Court and remanded to the agency for completion of the review process."); *Summit Lake Paiute Tribe of Nevada v. U.S. Bureau of Land Management*, 496 Fed.Appx. 712, 714 (9th Cir. Oct. 22, 2012) (where tribe challenged agency's decision granting pipeline permits, and pipeline construction was complete, "effective relief is still available as long as the ongoing effects the pipeline continues to have on the Tribe's cultural property … can be mitigated"); *Ouachita Riverkeeper v. Bostick*, 938 F. Supp.2d 32, 44 (D.D.C. 2013) (plaintiff maintained standing, even after pipeline was operational, because "[t]he threat to Mr. Calaway's property remains, and the Defendant-Intervenors do not even attempt to show that the risk of leaks cannot be remedied at this stage"). In short, after consideration of the parties' respective arguments concerning standing, the undersigned is not persuaded that the injuries claimed by Baykeeper's members cannot be redressed following completion of construction of the pipeline; to the contrary, it appears that some form of effective relief could be fashioned (whether by this Court or by the Corps on remand) to reduce aesthetic injuries to Baykeeper members, to mitigate risk of leakage, and so on.[9]

Based on the above, the Court overrules Plains Southcap's objections to Baykeeper's standing to pursue this lawsuit. On the record presented here, Baykeeper has shown an injury in fact that is fairly traceable to the Corps' verification decisions and that could be redressed in the event of a favorable outcome here. Plaintiff has established Article III standing.

### 2.    *Mootness as to Stream Crossings.*

Both the Corps Defendants and Plains Southcap have invoked the doctrine of mootness as a means of narrowing the issues in this case. In particular, the Corps explains that Plains Southcap's modification of the project in early 2014 to utilize horizontal directional drilling ("HDD") for various stream crossings in the Hamilton Creek watershed removes those activities

---

[9]    Insofar as Plains Southcap's redressability argument is based on subsequent design modifications for the pipeline that did not require Corps verification, that issue is addressed *infra* in the context of a mootness analysis.

from the Corps' jurisdiction.  As will be explained in detail in § IV.B., *infra*, the Corps' verification decisions here were made pursuant to Section 404 of the CWA.  That provision authorizes the Corps to issue permits for the discharge of dredged or fill material into navigable waters of the United States.  But HDD involves installing pipeline far beneath the streams, with no trench excavation or surface disturbance at the crossings; therefore, there is no dredged or fill material discharged in waterways by these HDD techniques.[10]  Defendants' argument, then, is that the Corps lacked jurisdiction to regulate, approve, verify, disqualify, or reject Plains Southcap's HDD stream crossings because they fall outside of the scope of the Corps' § 404 permitting authority.  On that basis, the Corps Defendants maintain that "there is nothing for the Court to review with regard to those stream crossings and no relief for the Court to award, and therefore Baykeeper's claims regarding the crossing of streams in the Hamilton Creek watershed are moot."  (Doc. 43, at 11.)

The Eleventh Circuit has opined that "[a]n issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief."  *Friends of Everglades v. South Florida Water Management Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) (citations and internal quotation marks omitted).  "To decide a moot issue is to issue an advisory opinion, one unnecessary to the judicial business at hand and outside the authority of Article III courts."  *Id.* Thus, "[i]f events that occur subsequent to the filing of a lawsuit … deprive the court of the ability to give the plaintiff … meaningful relief, then the case is moot and must be dismissed." *Defenders of Wildlife v. Bureau of Ocean Energy Management, Regulation, and Enforcement*, 791 F. Supp.2d 1158, 1165 (S.D. Ala. 2011) (citations omitted).

As noted, the gravamen of Baykeeper's Complaint is that the Corps' January 2013 verifications of the Alabama portion of the pipeline violated the CWA, the APA and governing rules and regulations.  When those verifications were issued, Plains Southcap's announced design involved numerous stream crossings in the Hamilton Creek watershed to be accomplished

---

[10]     Without objection or dissent from plaintiff, Plains Southcap summarizes the HDD method as follows:  "[A]t many of the stream crossings in the watershed the pipe is now buried 80 to 120 feet below the surface.  Two consequences of this HDD process are these: First, there are not true 'crossings' of these waterways, since the pipe passes far beneath the streams; second, the HDD installation is accomplished by boring a tunnel from an entry point to an exit point with no surface disturbance along the span."  (Doc. 46, at 7-8.)

by digging shallow trenches, thereby producing dredged or fill material that would be discharged (at least temporarily) into waterways.[11] It is undisputed, however, that (i) Plains Southcap actually built the pipeline using HDD techniques that eliminated certain of those stream crossings by burying the pipeline dozens of feet below the watercourses; (ii) HDD techniques are not subject to Corps regulation under § 404 of the CWA because they do not result in the discharge of dredged or fill material in territorial waters (*i.e.*, HDD did not involve excavation of a trench or the temporary side cast of material from the trench into waters of the United States during installation of the pipeline); and (iii) the January 2013 verifications were unnecessary and irrelevant to those crossings achieved via HDD.[12] This Court cannot order the Corps to revisit the propriety of the pipeline's stream crossings in the Hamilton Creek watershed using HDD methods because, again, those activities fall outside the Corps' jurisdiction conferred by § 404 of the CWA, in that they do not involve discharge of dredged or fill materials in U.S. waters. Furthermore, directing the Corps to rescind or re-examine the January 2013 verifications it granted for trench excavation at stream crossings would be a hollow, empty, meaningless

---

[11]     Indeed, the Corps' January 2013 Decision Document explained that the Corps' involvement in the matter was because "the pipeline project will result in the temporary trenching of 22 stream crossings, and the mechanized land-clearing, temporary trenching and side-casting of fill, …." (AR 1005.) The diagrams at AR 1032-34 depict the "Trench and Spoil Side Method," as well as two waterbody crossing methods involving trench excavation and the temporary deposit of "spoil" near the waterbody's banks, that Plains Southcap originally intended to use to lay the pipeline at the crossings.

[12]     Plaintiff excoriates defendants for their failure to submit evidence to prove that Plains Southcap actually used HDD methodology for the subject stream crossings. (*See* doc. 47, at 11.) Certainly, it would have been extraordinarily helpful for defendants to present specific evidence in the summary judgment record (as contrasted with the administrative record) documenting how the project was ultimately constructed, rather than relying on the *ipse dixit* of counsel. Nonetheless, there is uncontroverted evidentiary support for defendants' representations in the court file, in the form of written correspondence between Plains Southcap and the Corps in February 2014. (*See* docs. 34-1 & 34-2.) These exhibits (which defendants have cited in their summary judgment submissions) confirm that Plains Southcap had modified the pipeline design to incorporate HDD techniques for certain stream crossings in the Hamilton Creek watershed. The sole reasonable inference to be drawn from that correspondence is that Plains Southcap in fact constructed the pipeline in accordance with those modified plans as described to the Corps in the February 2014 letters. Plaintiff has not raised a whiff of a suggestion (much less any evidence) to the contrary.

exercise as to crossings where the pipeline was ultimately built using HDD techniques rather than conventional trench-and-spoil methods.

These circumstances epitomize the mootness doctrine. The Court cannot provide Baykeeper with effective relief as to its statutory and regulatory challenges of Corps verifications pertaining to stream crossings that Plains Southcap ultimately accomplished using horizontal directional drilling. The Corps is not empowered to regulate those HDD activities. And the verifications that the Corps issued for trenches to be dug at those stream crossings are now superfluous because those crossings were actually completed in a manner that involved no trenches, no discharge of dredged or fill material into United States waters and, hence, no activities for which Corps approval was needed. To the extent, then, that Baykeeper is asking this Court to prescribe relief for waterway crossings ultimately accomplished by means of HDD techniques that neither produced dredged/fill material in territorial waters nor otherwise fell within the Corps' regulatory purview, plaintiff's claims are **moot**.[13]

The Corps Defendants' mootness argument is compelling, as far it goes; however, it does not dispose of the entire case, for several reasons. First, the summary judgment record does not establish that Plains Southcap replaced the trenching methodology with HDD as to all stream

_____

[13]    In response, Baykeeper invokes the doctrine of voluntary cessation, which is an exception to the general rule of mootness. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Jacksonville Property Rights Ass'n, Inc. v. City of Jacksonville, FL*, 635 F.3d 1266, 1275 (11th Cir. 2011) (citations omitted). That exception does not fit the circumstances of this case. Baykeeper is not challenging a Corps "practice" of doing or not doing anything; rather, it is challenging a singular, discrete set of verification decisions made on a particular date for a particular project. Besides, the Corps did not cease doing anything; rather, it made a verification decision, then notified Plains Southcap that no verification was needed for stream crossings to be accomplished by HDD without discharging dredged or fill material. Thus, this is simply not a case in which the Corps "is attempting to manipulate the court's jurisdiction to insulate a favorable decision from review," *Harrell v. The Florida Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) (citation and internal marks omitted), which is the point of the voluntary cessation doctrine in the first place. *See Jacksonville Property*, 635 F.3d at 1275 (voluntary cessation exception to mootness is needed because "[o]therwise, a party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close") (citation omitted). There is no challenged Corps "practice" here, and the Corps changed nothing after the inception of this lawsuit; therefore, voluntary cessation principles cannot preserve Baykeeper's claims from mootness.

crossings along Hamilton Creek or in the Big Creek Lake watershed in Mobile County. Plains Southcap's February 2014 letter to the Corps references its decision "to increase the length of the HDD under Hamilton Creek and to install two other segments of the pipeline in the area of the Hamilton Creek watershed by HDD" (doc. 34-1, at 2), but does not specify whether all Alabama stream crossings are being eliminated. The Corps' response to that letter recognizes that no permit or verification is needed for HDD activities, but also states, "Your previous authorization under Nationwide 12 *for the remainder of the crossings* remains in effect." (Doc. 34-2, at 1 (emphasis added).) Certainly, as of February 28, 2014, the Corps was under the impression that, even after taking into account the project modifications, Plains Southcap would still be engaging in "crossings" as to which NWP 12 authorization was needed. More broadly, defendants submit no record facts to the Court identifying the extent to which the previously approved trench excavation stream crossings were replaced by HDD in the final project design. The Court will not simply assume or guess that all stream crossings were eliminated, particularly where the only record evidence indicates otherwise.

Second, as plaintiff correctly points out, defendants' briefs leave considerable ambiguity on this point. Plains Southcap uses equivocal language in describing the project modifications, using statements such as the following: (i) "at many of the stream crossings in the watershed the pipe is now buried 80 to 120 feet below the surface" (doc. 46, at 7-8); (ii) "[t]hose changes eliminated most of the ground level stream crossings" (*id.* at 11). Words like "many" and "most" are not synonymous with "all," and defendants' subsequent attempts to explain away this terminology cannot carry the day in a Rule 56 analysis.[14]

Third, and most fundamentally, all parties appear to be in agreement that, irrespective of the use of HDD to install the pipeline at various stream crossings in the area of concern, Plains

---

[14]     In particular, the Corps Defendants interpret Plains Southcap's statements as "concern[ing] the entire pipeline, which includes some stream crossings that are not in the Hamilton Creek watershed." (Doc. 49, at 2.) But Plains Southcap has offered no such explanation for its representations. More importantly, no one has explained why, in the context of briefing in litigation concerned solely with environmental effects in the Big Creek Lake / Hamilton Creek watershed, the intervenor-defendant would be writing about stream crossings in other places beyond the boundaries of that litigation. Once again, no party has directed the Court to any evidence that might clarify this important factual point as to the extent to which watershed stream crossings were performed via HDD rather than trench excavation.

Southcap still engaged in activities within the Big Creek Lake / Hamilton Creek watershed that required Corps verification under § 404 of the CWA.[15]  As to those activities, the parties' dispute is very much a live controversy.  For Plains Southcap's pipeline construction activities within the watershed that are covered by § 404, Baykeeper's claims pertaining to the Corps' verification decision under NWP 12 are not moot because Baykeeper is challenging the project as it was actually completed, is challenging activities within the Corps' jurisdiction, and is raising challenges as to which some measure of remedial relief could be fashioned if Baykeeper were to prevail.  Accordingly, while Defendants' mootness arguments do resonate with regard to a portion of the construction project (*i.e.*, Plains Southcap's claims concerning Corps verifications of stream crossings that were ultimately accomplished via HDD, and therefore outside the Corps' jurisdiction), they neither obviate nor require dismissal of the entire lawsuit.[16]

---

[15]     *See* doc. 43, at 11 ("The Corps notes that some permitted activities in the Hamilton Creek watershed remain.  These activities involve the removal of vegetation in wetlands and temporary discharges of dredged or fill materials into wetlands associated with the construction of trenches where the pipeline crosses wetlands."); doc. 47, at 13-14 ("It is undisputed that Plains has not avoided all the stream and wetlands impacts in the Big Creek Lake watershed … [T]here are still substantial portions of wetlands and stream crossings in the Big Creek Lake watershed that remain under the Corps' jurisdiction, as far as Baykeeper has been able to discern."); doc. 49, at 3 ("Some wetland crossings do remain, which are subject to the Corps' verification of the applicability of Nationwide Permit ('NWP') 12.").

[16]     It is no answer to argue, as the Corps Defendants do, that "Baykeeper has never made any claim that these [wetland] crossings pose a risk to the drinking water intake."  (Doc. 49, at 3.)  All appearances are to the contrary.  For example, in its principal summary judgment brief, Baykeeper asserts that "[i]f the Corps were to decide that these stream crossings **and wetland impacts** were within proximity to the [public water intake], then, due to General Condition 7, the Corps would be barred from verifying those crossings and wetlands impacts under NWP 12."  (Doc. 39, at 16 (emphasis added).)  The Corps Defendants' conclusory suggestion that Baykeeper's suit is not predicated on verification of wetlands crossings in the Hamilton Creek watershed thus appears counterfactual.  Defendants have provided the Court with no reason to believe that Baykeeper's legal arguments concerning the pipeline's stream crossings (*i.e.*, proximity to public water supply intake, public interest, environmental impacts) do not apply with equal force to wetlands activities of the same project.  To be sure, the Corps Defendants may be correct that "Baykeeper makes no specific claims with regard to these trenched pipeline segments" (doc. 43, at 12), but Baykeeper's legal arguments do not exclude those segments; rather, by all appearances, they apply equally to all.

### 3. *Laches.*

As a final preliminary issue before reaching the merits, Plains Southcap objects that Baykeeper's claims are barred by principles of laches. "Laches is an equitable doctrine that bars a plaintiff's claims if granting his requested remedy would be inequitable due to his delay in filing suit." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, --- F. Supp.2d ----, 2014 WL 2123200, *8 (N.D. Ala. May 21, 2014). "To apply laches in a particular case, the court must find both that the plaintiff delayed inexcusably in bringing the suit and that this delay unduly prejudiced defendants." *Howard v. Roadway Exp., Inc.*, 726 F.2d 1529, 1532 (11th Cir. 1984) (citation omitted); *see also Black Warrior*, 2014 WL 2123200, at *8 ("Laches applies when the moving party shows (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.") (citation and internal quotation marks omitted). Whether to apply laches in a particular case is a decision left to the discretion of the trial court. *See, e.g., Watz v. Zapata Off-Shore Co.*, 500 F.2d 628, 633-34 (5th Cir. 1974) ("We recognize that because laches is a creature of equity the trial judge enjoys a wide area of discretion."); *Murray v. Sevier*, 993 F. Supp. 1394, 1404 (M.D. Ala. 1997) ("Laches is an equitable doctrine committed to the sound discretion of the trial court.") (citation omitted).

In exercising that discretion, the Court is cognizant that, although the Eleventh Circuit has not weighed in on this point, numerous other federal authorities have classified laches as a disfavored defense in the environmental context. *See, e.g., Save the Peaks Coalition v. U.S. Forest Service*, 669 F.3d 1025, 1031 (9th Cir. 2012) ("Because environmental damage does not inflict harm only on the plaintiff, laches is strongly disfavored in environmental cases.").[17] The

---

[17] *See also Daingerfield Island Protective Soc. v. Lujan*, 920 F.2d 32, 38 (D.C. Cir. 1990) ("Nearly every circuit … and numerous district courts have recognized the salutary principle that laches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy.") (citations and internal marks omitted); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337-38 (10th Cir. 1982) ("The defense of laches is available in environmental litigation but is disfavored because of the interests of the public in environmental quality and because the agency would escape compliance with NEPA if laches were generally applied, thus defeating Congress' environmental policy."); *Animal Welfare Institute v. Martin*, 588 F. Supp.2d 70, 94 (D. Me. 2008) ("In general, the doctrine is disfavored in environmental cases, where the purported injury is commonly not (Continued)

undersigned finds the rationale of those decisions compelling; therefore, Plains Southcap's laches argument will be evaluated subject to the judicial gloss of its disfavored status.

With regard to the factor of inexcusable delay, the record establishes the following relevant chronology: Baykeeper first learned of the proposed Plains Southcap pipeline in summer 2013. (Callaway Decl. (doc. 47, Exh. A), ¶ 7.) Shortly after Baykeeper became aware of the pipeline, it began monitoring ongoing litigation between Plains Southcap and the Mobile Area Water and Sewer System (the "MAWSS Litigation") whose outcome might prevent the pipeline from being routed through the Big Creek Lake watershed. (*Id.*, ¶ 9.)[18] Baykeeper learned in September 2013 that MAWSS had initially prevailed in that lawsuit, such that "it appeared that Plains would not be able to construct the pipeline through the watershed." (*Id.*, ¶ 10.) Plains Southcap appealed that adverse ruling in the MAWSS Litigation, and obtained a reversal in Mobile County Circuit Court in December 2013. (*Id.*, ¶¶ 11-12.) Baykeeper understood from public statements in December 2013 and early January 2014 that MAWSS intended to appeal from the Circuit Court ruling, and that no construction of the pipeline on MAWSS property (the precise area of concern to Baykeeper) had yet commenced. (*Id.*, ¶¶ 13-14.) Nonetheless, Baykeeper proceeded to file this lawsuit against the Corps Defendants on January 24, 2014 (*see* doc. 1), prior to Plains Southcap beginning construction in the challenged area and more than a month before entry of final judgment in the MAWSS Litigation. These facts and circumstances readily establish that Baykeeper did not delay inexcusably in

---

limited to the party bringing suit."); *Pamlico-Tar River Foundation v. U.S. Army Corps of Engineers*, 329 F. Supp.2d 600, 612 (E.D.N.C. 2004) ("Laches is disfavored in environmental cases."); *Sierra Club v. Pena*, 915 F. Supp. 1381, 1394 (N.D. Ohio 1996) ("Laches is a disfavored defense in environmental litigation because the outcome of the suit affects more people than the named plaintiffs."); *Natural Resources Defense Council, Inc. v. Fox*, 909 F. Supp. 153, 160 (S.D.N.Y. 1995) ("[L]aches is no defense in a suit to enforce a public right or protect the public interest. … Because a citizen suit to enforce a non-discretionary duty of the Administrator [of the EPA] is a suit to protect the public interest, laches does not apply.").

[18]     The MAWSS Litigation was filed in state court and litigated initially in Mobile County Probate Court. The Court's understanding is that Plains Southcap sought condemnation of MAWSS property in the watershed along the pipeline route, but that MAWSS resisted such efforts based on environmental concerns arising from the planned placement of a crude oil pipeline near the region's drinking water supply.

commencing this lawsuit against the Corps Defendants; therefore, the Court finds in its discretion that the doctrine of laches is inapplicable.[19]

---

[19]     In so concluding, the Court has carefully considered Plains Southcap's counterarguments. For example, Plains Southcap suggests that Baykeeper inexcusably delayed when it "stood by and watched MAWSS battle the pipeline" instead of filing its own lawsuit right away. (Doc. 50, at 11.) To accept Plains Southcap's position would be to champion the (potentially unnecessary and wasteful) proliferation of lawsuits. As of September 2013 – shortly after Baykeeper learned of the pipeline route – a ruling in the MAWSS Action effectively barred Plains Southcap from constructing the pipeline on that route. Under the circumstances, it would have been inefficient, duplicative and pointless for Baykeeper to file its own lawsuit to attempt to stop the pipeline at that time (just in case any MAWSS Action appeals went the other way), because Plains Southcap was already laboring under a ruling that would not allow it to go forward with construction. Baykeeper's delay from September through December 2013 (when the state-court ruling was reversed) was neither unreasonable nor inequitable. Next, Plains Southcap lambastes Baykeeper for not filing a motion for preliminary injunction at the outset of this action. But the Eleventh Circuit has construed the doctrine of laches as requiring "that the plaintiff delayed inexcusably *in bringing the suit*," *Howard*, 726 F.2d at 1532 (emphasis added), not that the plaintiff delayed in moving for expedited injunctive relief after suit was underway. This distinction is quite reasonable, given the equitable purposes of the doctrine. If a plaintiff waits to sue until after an entity has completed the challenged action, that could be unfair and inequitable because the entity is blindsided after having already expended time, money and resources on the challenged action. However, if a plaintiff files suit before the entity has taken the challenged action (as was the case here), the entity is on notice of the ongoing legal efforts to block or undo such action. There is no unfair surprise. If the entity decides to go forward with those activities despite the pending legal action (as Plains Southcap did here), it has taken a calculated risk that it will prevail in the lawsuit and cannot then be heard to cry foul (as Plains Southcap now does) that the plaintiff should have done something more to restrain the entity from moving forward during the pendency of the suit.

Stated plainly, before it ever dug the first trench in the condemned MAWSS lands in the Big Creek Lake watershed, Plains Southcap knew that Baykeeper was suing to require further Corps review of the pipeline project. Plains Southcap knew that if Baykeeper succeeded, the result could be extreme and expensive modifications, potentially including rerouting of the pipeline outside the watershed. Despite that knowledge, Plains Southcap went forward with business as usual, proceeding with the construction project in the watershed as if this lawsuit did not exist. That decision was certainly Plains Southcap's prerogative. But it forecloses any reasonable argument by Plains Southcap that equity bars Baykeeper from continuing with this lawsuit now that the pipeline is done. In essence, Plains Southcap is maintaining that this case should be dismissed because Baykeeper did not save Plains Southcap from itself (or, more accurately, its own risky decision-making) by filing a motion for preliminary injunction at the outset of this case. The equities do not favor, and cannot support, such an outcome.

-18-

## B.     The CWA Verification Framework and NWP 12.

Having dispensed with these lengthy preliminaries, the Court now turns to the heart of the matter, which is whether the Corps complied with its legal obligations in issuing the January 2013 verifications for the pipeline project.

To place this dispute in context, it is critically important to understand the regulatory framework in which the Corps was operating in connection with the subject verifications. The Clean Water Act provides that the Corps "may issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters" of the United States. 33 U.S.C. § 1344(a); *see also Save Our Community v. U.S. E.P.A.*, 971 F.2d 1155, 1162 n.13 (5th Cir. 1992) ("the CWA allocates responsibility to the Corps to issue permits for the discharge of dredged or fill material into navigable waters pursuant to section 404"). The statute does not restrict the Corps to issuance of individual permits on an activity-by-activity basis; rather, Congress authorized the Corps to issue general permits on a nationwide basis for certain categories of activities involving discharges of dredged or fill material. *See* 33 U.S.C. § 1344(e)(1) ("the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment"). Such general permits remain in effect for up to five years, and are subject to revocation or modification by the Corps. *Id.* § 1344(e)(2).

In reliance on this Congressional directive, the Corps has issued a number of nationwide permits ("NWPs"), which "are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts. The NWPs are proposed, issued, modified, reissued (extended), and revoked from time to time after an opportunity for public notice and comment." 33 C.F.R. § 330.1(b). Some (but not all) NWPs require the permittee to provide advance notification to the Corps before engaging in an activity that it believes to be within the scope of the NWP. In that event, the Corps' District Engineer ("DE") "will review the notification and may add activity-specific conditions to ensure that the activity complies with the terms and conditions of the NWP and that the adverse impacts on the aquatic environment and other aspects of the public interest are individually and cumulatively minimal." 33 C.F.R. §

330.1(e)(2); *see also* 33 C.F.R. § 330.6(a)(3)(i) ("The DE may add conditions on a case-by-case basis to clarify compliance with the terms and conditions of an NWP or to ensure that the activity will have only minimal individual and cumulative adverse effects on the environment, and will not be contrary to the public interest."). This review process may culminate in the DE issuing a verification to the permittee, thereby allowing the activity to move forward.

The nationwide permit of interest in this case is NWP 12, which the Corps issued on February 21, 2012. *See* 77 Fed. Reg. 10,184. By its terms, "[t]his NWP authorizes the construction, maintenance, or repair of utility lines … and the associated excavation, backfill, or bedding for the utility lines, in all waters of the United States, provided there is no change in pre-construction contours." 77 Fed. Reg. 10,271. NWP 12 requires the permittee to submit pre-construction notification ("PCN") to the Corps if certain criteria are present, and it is undisputed that Plains Southcap was subject to (and complied with) the PCN requirement in this case.

The applicable Corps rule specifies that "[t]o qualify for NWP authorization, the prospective permittee must comply with … general conditions" enumerated therein. 77 Fed. Reg. 10,282. The agency rule enumerates 31 general conditions. Of those, General Condition 7 provides, in relevant part, that "[n]o activity may occur in the proximity of a public water supply intake." *Id.* at 10,283. And General Condition 31 states that "[i]n reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." *Id.* at 10,287. General Conditions 7 and 31 lie at the heart of Baykeeper's legal challenges herein.

### C. Whether the Verifications were Arbitrary and Capricious.

Baykeeper identifies three purported deficiencies with the Corps' verification decisions pursuant to the above-described statutory and regulatory framework, to-wit: (i) the Corps failed to consider whether the pipeline was in proximity to the public water supply intake (as required by General Condition 7); (ii) the Corps failed to consider whether the pipeline was contrary to the public interest (as required under NWP 12 and General Condition 31); and (iii) the Corps failed to provide a reasoned explanation for its determination of minimal cumulative effects (as required under General Condition 31 and the APA). (Doc. 39, at 16-25.) The parties' cross-motions for summary judgment delineate their dueling positions as to each of these issues.

### 1. Standard of Review.

As a threshold matter, the parties appear to be in agreement that judicial review of the Corps' verification decisions for the Plains Southcap pipeline is governed by the Administrative Procedure Act's deferential arbitrary and capricious standard. (*See* docs. 39, at 9-10; doc. 46, at 15-16.) Pursuant to that standard, a reviewing court may set aside agency action as unlawful only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Corps' challenged actions are reviewed for clear error, and this Court cannot simply second-guess the agency's judgment. *See Sierra Club v. Johnson*, 541 F.3d 1257, 1264 (11th Cir. 2008). "The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). "This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible …, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Id.* at 1361.

Notwithstanding the deferential nature of this process, however, "the court must also look beyond the scope of the decision itself to the relevant factors that the agency considered." *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002). A reviewing court may "find an agency action arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (citations omitted).[20] The Court's analysis proceeds in recognition of these principles.

---

[20] *See also Black Warrior Riverkeeper*, 2014 WL 2123200, at *10 ("An agency action may be found arbitrary and capricious if the agency relied on inappropriate factors, failed to consider important aspects, or provided explanations either contrary to the evidence or wholly implausible."); *Ouachita Riverkeeper*, 938 F. Supp. 2d at 39 ("An agency's decision may be arbitrary or capricious if: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (Continued)

## 2. *Proximity to Public Water Supply Intake.*

Baykeeper's first claim that the Corps' verification decisions under NWP 12 for the Alabama portion of the Plains Southcap pipeline are arbitrary and capricious hinges on General Condition 7.  Recall that the Corps has exercised its authority under 33 U.S.C. § 1344(e)(1) to issue a series of nationwide permits for the discharge of dredged or fill material into territorial waters.  One such nationwide permit is NWP 12, which authorizes "construction, maintenance, or repair of utility lines … and the associated excavation, backfill, or bedding for the utility lines, in all waters of the United States."  77 Fed. Reg. 10,271.  The Corps' final rule on the nationwide permit program provides that a permittee does not qualify under any nationwide permit (including NWP 12) unless it complies with certain enumerated general conditions.  General Condition 7 specifies that "[n]o activity may occur in the proximity of a public water supply intake."  *Id.* at 10,283.

Baykeeper seizes on this condition.  A fundamental premise of this lawsuit is Baykeeper's contention that the Corps' verification of the Plains Southcap pipeline is arbitrary and capricious because "there is nothing in the Administrative Record that indicates the Corps ever considered the public water supply intake," yet the verified activities included "multiple impacts less than two miles from a public water supply intake and less than one mile from a sole source drinking water supply."  (Doc. 39, at 16.)  Plaintiff's position, then, is that the Corps was obligated to consider proximity to public water supply intake before issuing NWP 12 verifications to Plains Southcap, yet it failed to do so.  Had the Corps considered this factor, Baykeeper reasons, it never would have issued those verifications, inasmuch as the Plains Southcap pipeline was routed in proximity to the public water supply intake in violation of General Condition 7.

To be clear, it is evident that the Corps did <u>not</u> consider whether the pipeline was in the proximity of a public water supply intake on Big Creek Lake in issuing the challenged verification decisions.  The Corps does not profess to have done so.  The Administrative Record is devoid of documentation revealing that the Corps considered that factor or made any

---

(iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment.").

"proximity" findings. In short, there is no indication in the court file that the Corps examined whether Plains Southcap was in compliance with General Condition 7 before issuing the subject verifications under NWP 12.[21] Properly framed, then, the legal issue presented on summary judgment is not whether the Corps' "proximity" analysis in this case was sufficient, but whether the Corps was obligated to examine proximity at all before issuing the challenged verifications. On that point, the Corps Defendants' unequivocal stance is that "the Corps is not required to determine that the project will comply with General Condition 7 in verifying that it falls within the scope of NWP 12." (Doc. 49, at 5.) By contrast, Baykeeper embraces an opposite but equally adamant position that "the Corps has simply failed to perform its legal duty" (doc. 47) to assure compliance with General Condition 7 before issuing NWP 12 verifications to Plains Southcap.

Both the parties' briefs and the undersigned's own research confirm that case authority addressing this issue directly is sparse. The leading opinion is *Snoqualmie Valley Preservation Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155 (9th Cir. 2012). In that case, a plaintiff challenging verifications issued under the nationwide permit program faulted the Corps for failing to evaluate the project for compliance with all general conditions. The *Snoqualmie Valley* court observed that the nationwide permit system was designed "to enable the Corps to quickly reach determinations regarding activities that will have minimal environmental impacts …. Requiring an elaborate analysis of the applicable regulations and the facts would defeat this purpose." *Id.* at 1163. The court continued that "even where pre-construction notification *is* required, a permittee is not required in most cases to supply the Corps with information about how the project will satisfy each general condition." *Id.* at 1164. Furthermore, the panel reasoned, because the general conditions at issue did not expressly place a burden on the applicant to provide documentation to the Corps, "[w]ithout such documentation, it would be an

---

[21] This is not a case in which the Corps made specific findings that the challenged activity was not in proximity with the public drinking water supply intake; rather, the Corps simply did not examine this issue. Plains Southcap's assertion to the contrary is unsupported by the Administrative Record. *See* doc. 46, at 14 (referencing what Plains Southcap calls "the Corps' decision that minor discharge activities located 2 miles or more away from public water intake are not 'in the proximity of' that intake for purposes of General Condition 7"). There is simply no record basis for the proposition that the Corps actually engaged in such a "proximity" analysis here.

absurd result to require the Corps to evaluate and explain how [the permittee] will comply with these conditions." *Id.* On that basis, the *Snoqualmie Valley* court concluded as follows: "The nationwide permit system is designed to streamline the permitting process. We decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have." *Id.*

Other courts have followed *Snoqualmie Valley*'s lead by similarly emphasizing the streamlining purpose of the nationwide permit system and the resulting diminution of the Corps' investigative and evaluative responsibilities prior to issuing verifications. As one district court wrote, "The purpose of the statute that authorizes general permits such as the nationwide permit at issue here is to allow the Corps to designate certain construction projects as eligible for CWA discharge permits with little, if any, delay or paperwork because they fit within these pre-cleared categories of activities." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp.2d 9, 26 (D.D.C. 2013) (citation and internal quotation marks omitted).[22] That same court opined that "[w]hen a prospective permittee files a pre-clearance notice, the only thing left to be done is for the Corps's district engineers to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized." *Id.* at 27; *see also Sierra Club v.*

---

[22] Commentators have echoed this sentiment by characterizing the general permit system as a "mechanism to ameliorate the regulatory costs and burdens created by the judicial mandate that jurisdiction must be exercised over all waters of the United States." Parish & Morgan, *History, Practice, and Emerging Problems of Wetlands Regulation: Reconsidering Section 404 of the Clean Water Act*, 17 Land & Water L. Rev. 43, 57 (1982). Other courts have made similar observations. *See, e.g., Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown*, 875 F.2d 453, 465 (5th Cir. 1989) ("the nationwide permits of 33 C.F.R. § 330 are specifically designed to expedite activities with inconsequential effects"); *Orleans Audubon Soc. v. Lee*, 742 F.2d 901, 909 (5th Cir. 1984) ("[t]he purpose of the nationwide permit system is to allow certain types of discharges to be made without prior Corps approval"); *National Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 453 F. Supp.2d 115, 120 (D.D.C. 2006) ("The purpose of general permits, including nationwide permits ('NWP'), issued under Section 404(e) of the CWA is to allow projects that cause minimal environmental impact to go forward with little delay or paperwork. … If a party discharges pollutants into navigable waters without meeting the conditions of a general permit …, then the party can be subject to enforcement actions, such as a civil administrative action by the Corps or a civil and criminal proceeding by the Department of Justice."); *Sierra Club, Inc. v. Bostick*, 2012 WL 3230552, *2 (W.D. Okla. Aug. 5, 2012) ("The purpose of general permits, including Nationwide Permit 12 ('NWP 12'), issued pursuant to Section 404(e) of the CWA, is to permit projects that cause minimal environmental impact to proceed with little delay or paperwork.").

*United States Army Corps of Engineers*, --- F. Supp.2d ----, 2014 WL 4066256, *10 (D.D.C. Aug. 18, 2014) ("when a party approaches the Corps under the general permitting scheme …, such party is merely requesting 'verification' of their own belief that the proposed construction project satisfies the Corps's previously established requirements").

Important insights emerge from the *Snoqualmie Valley* line of authorities. For starters, those opinions emphasize that the nationwide permit program authorized by the CWA is designed to be streamlined and efficient at the verification stage. To be sure, the process of issuing a particular nationwide permit covering an entire category of construction activities is exacting, exhaustive, and thorough.[23] But the Corps completed that review back in February 2012, when it issued NWP 12. Having accomplished that extensive study for this category of activities (*i.e.*, construction, maintenance and repair of utility lines), the Corps has already determined that activities within that category involving discharges of dredged or fill material cause only minimal adverse environmental effects, both separately and cumulatively. *See* 33 U.S.C. § 1344(e)(2). Because NWP 12 is already in place, the *Snoqualmie Valley* strand of case authorities explains, the Corps' heavy lifting for a verification request like Plains Southcap's (falling within that pre-cleared category of activities delineated by NWP 12) has already been done. This is starkly different from an individual permitting decision. Furthermore, this distinction plays directly into the *raison d'etre* of the nationwide permit system, which is to expedite issuance of CWA discharge permits with minimal delay or paperwork for certain pre-cleared categories of activities so as to mitigate what would otherwise be considerable regulatory costs, burdens and delays for agency and permittee alike.

Viewed through this lens, forcing the Corps to perform an extensive environmental review in the verification context under NWP 12 would (i) duplicate work already performed at the nationwide permit stage in pre-clearing this category of activities; (ii) contravene the purpose of the nationwide permit process; (iii) increase exponentially the documentation a permittee must

---

[23]    *See, e.g., Sierra Club*, 2014 WL 4066256, at *10 ("under the general permitting system, the Corps has already concluded that covered activities can proceed based on an extensive environmental impact study that the agency does periodically regarding such construction activities on a regional or nationwide basis"); *Sierra Club*, 990 F. Supp.2d at 27 ("under the nationwide permit system, the Corps has already done an environmental review on a general categorical basis").

submit to the Corps, including numerous items not specifically delineated as required documentation in the General Conditions; and (iv) multiply the delay and expense associated with verifications so as to render them functionally indistinguishable from individual permit decisions, thus collapsing two conceptually distinct regulatory processes into one. This rationale provides compelling support for the Ninth Circuit's conclusion that federal courts should "decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have." *Snoqualmie Valley*, 683 F.3d at 1164. Rather, the Corps' role at the verification stage is simply "to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized." *Sierra Club*, 990 F. Supp.2d at 27.

In response to defendants' reliance on *Snoqualmie Valley* and its ilk, Baykeeper does not identify any contrary case authority. It cites no opinions finding that the Corps must perform an in-depth analysis of each general condition before issuing a verification under a nationwide permit. While Baykeeper insists that the Corps was obligated to verify Plains Southcap's compliance with General Condition 7 before granting NWP 12 verification for the pipeline, it does not hold out a single case supporting such a result. Baykeeper neither criticizes the reasoning of *Snoqualmie Valley* nor cites any decisions suggesting that *Snoqualmie Valley* was wrong to "decline to impose a new requirement of a full and thorough analysis of each general condition" by the Corps. Instead, Baykeeper states that both *Snoqualmie Valley* and the District of the District of Columbia's decisions in *Sierra Club v. U.S. Army Corps of Engineers* are factually distinguishable. (Doc. 47, at 8-9.) Such an effort to sidestep these authorities is unavailing because nothing in plaintiff's proffered distinctions would undermine the pertinent reasoning (as discussed *supra*) of those cases or its applicability to the Corps' responsibilities here. The utility of *Snoqualmie Valley* is not that it is factually or procedurally on all fours with our case (it is not), but rather is that *Snoqualmie Valley* provides a clear-eyed, lucid explanation of why, in the context of the § 404 regulatory scheme, the Corps is not, and should not be, obligated to conduct an in-depth examination of a project's compliance with each General Condition before issuing a verification under a nationwide permit. Thus, the purported distinctions cited by Baykeeper are inconsequential and unavailing.

As the foregoing discussion demonstrates, this Court is not blindly following *Snoqualmie Valley* in isolation. A collage of other persuasive factors, considered in tandem with *Snoqualmie*

*Valley*, prompt the conclusion that the Corps was not required to study compliance with General Condition 7 before issuing NWP 12 verifications on the Plains Southcap pipeline. First, this result appears to be fully consistent with, and a natural extension of, the purposes underlying the nationwide permit system. Nationwide permits are intended to reduce administrative costs and burdens, and to allow projects in pre-cleared activities to move forward with little delay or paperwork. Demanding that the Corps conduct a searching examination of every general condition for every verification request would undermine those purposes. Second, neither plaintiff nor this Court has located any persuasive authority contrary to *Snoqualmie Valley*. Third, nothing in the text of the Corps' final rule for nationwide permits indicates that the Corps must perform an independent analysis of a project's risks to public water supply intakes and make a "no proximity" finding under General Condition 7 before issuing verifications.[24] Fourth, adopting *Snoqualmie Valley* principles here would not render General Condition 7 illusory or a

---

[24] By contrast, certain other general conditions are couched in specific directives to the Corps or the appropriate District Engineer ("DE"). For example, General Condition 18 (Endangered Species) specifies that the permittee must provide the DE with documentation establishing its compliance with the Endangered Species Act and that "[t]he district engineer will review the documentation and determine whether it is sufficient to address ESA compliance for the NWP activity, or whether additional ESA consultation is necessary." 77 Fed. Reg. 10,283. General Condition 20 (Historic Properties) imposes analogous obligations on the permittee and the DE as to compliance with Section 106 of the National Historic Preservation Act. *Id.* at 10,284. General Condition 23 (Mitigation) recites a laundry list of facts that "[t]he district engineer will consider … when determining appropriate and practicable mitigation." *Id.* at 10,285. The point is clear: When the Corps wanted to create a mandatory review process for items that the DE must consider before verifying a project, it included appropriate language in the text of that general condition. The Corps knew how to use such language in its final rule; however, it omitted such language from the text of General Condition 7. Such omission raises a strong inference that the Corps never intended to impose a specific, mandatory review process by the DE as to that general condition before a verification may issue. *See Lindley v. F.D.I.C.*, 733 F.3d 1043, 1056 (11th Cir. 2013) (in context of statutory construction, rather than regulatory construction, "where Congress knows how to say something but chooses not to, its silence is controlling"); *United States v. Shellef*, 756 F. Supp.2d 280, 295 (E.D.N.Y. 2011) ("The Supreme Court has repeatedly emphasized in analyzing questions of statutory interpretation … that courts should not add or modify language to statutes where, as here, it is clear from other provisions within the same statute that Congress knew how to include such language if it so wished."); *Cremeens v. City of Montgomery*, 602 F.3d 1224, 1227 (11th Cir. 2010) ("We apply the canons of construction to regulations as well as to statutes."); *Black & Decker Corp. v. C.I.R.*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction.").

nullity; to the contrary, both record documents and authorities impose a duty on the permittee to comply strictly with General Condition 7 and all other general conditions, or else face the specter of an enforcement action.[25] Thus, adopting the Corps' position that it need not investigate compliance with General Condition 7 prior to issuing verification for an activity in a pre-cleared category would not foreclose the potential for effective, meaningful enforcement at a later time.

Fifth and finally, the *Snoqualmie Valley* line of reasoning dovetails neatly with the Corps' own interpretation of its final rule. The Corps drafted and (after a public notice and comment period) issued the rule governing the nationwide permit program, including NWP 12 and General Condition 7. In both its actions during the Plains Southcap verification process and its briefs in this litigation, the Corps construes this rule as not requiring a full and thorough analysis of compliance with General Condition 7 antecedent to issuance of a verification under NWP 12. Such an interpretation is consistent with *Snoqualmie Valley*. That interpretation is entitled to deference. It is well settled that "courts must give deference to an agency's reasonable interpretation of its own regulations." *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 912 (11th Cir. 2007). In that regard, reviewing courts "will uphold the agency's interpretation of its regulations so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Id.* (citation omitted).[26] The consistency between the appellate

---

[25] As noted previously, the Corps' verification letter dated January 18, 2013, expressly imposes a duty on Plains Southcap to "comply with all of the regional and general conditions and any project specific conditions of these verifications *or you may be subject to enforcement action*." AR 1013 (emphasis added). Likewise, one district court recognized that "[i]f a party discharges pollutants into navigable waters without meeting the conditions of a general permit …, then the party can be subject to enforcement actions, such as a civil administrative action by the Corps or a civil and criminal proceeding by the Department of Justice." *National Ass'n of Home Builders*, 453 F. Supp.2d at 120. As such, the onus was placed squarely on Plains Southcap to avoid discharging dredged and fill material in proximity to a public water supply intake. Had Plains Southcap violated this condition, the Corps or the Department of Justice could have held it accountable via enforcement action.

[26] *See also Vieux Carre Property Owners Residents and Associations, Inc. v. Brown*, 40 F.3d 112, 116 (5th Cir. 1994) ("an agency is afforded 'substantial deference' when it interprets its own regulations"); *Sierra Club v. U.S. Army Corps of Engineers*, 464 F. Supp.2d 1171, 1183 (M.D. Fla. 2006) ("If interpretation of an agency's regulation is at issue, the Court must defer to the agency's determination unless plainly erroneous, inconsistent with the regulation, or if the agency has promulgated a parroting regulation that does nothing more than paraphrase the statutory language that it should be implementing.") (citations and internal marks omitted); (Continued)

court's approach in *Snoqualmie Valley* and the Corps' interpretation of its own final rule in this case is another factor that weighs in favor of following *Snoqualmie Valley*.

After all the dust settles, what remains in this: The Corps did not investigate whether Plains Southcap's pipeline would be routed in proximity to a public water supply intake. Nonetheless, that omission did not render the Corps' NWP 12 verifications for the pipeline in January 2013 arbitrary and capricious, an abuse of discretion, or contrary to law. Applicable statutes and regulations did not obligate the Corps to perform such an in-depth pre-verification examination of compliance with General Condition 7. The Corps' interpretation of its final rule does not require any such action. And courts have opined that a contrary ruling would conflict with the stated purposes of the nationwide permit program under § 404 of the CWA. For all of these reasons, the Court finds as a matter of law that Baykeeper is not entitled to relief on its claim that the Corps' failure to consider General Condition 7 and the pipeline's proximity to the public water supply intake was arbitrary and capricious, an abuse of discretion, or contrary to law under the Administrative Procedure Act. Summary judgment will be granted in defendants' favor, and against Baykeeper, on this category of claims.[27]

---

*Sierra Club, Inc. v. Bostick*, 2013 WL 6858685, *23 (W.D. Okla. Dec. 30, 2013) ("We must give an agency's interpretation of its own regulations controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (citations and internal quotation marks omitted). Here, of course, the issue is the Corps' interpretation of its final rule, rather than a regulation, and that interpretation was made informally, rather than formally. Even so, some degree of deference remains appropriate. *See generally United States v. Mead Corp.*, 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (recognizing that "an agency's interpretation may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency … and given the value of uniformity in its administrative and judicial understandings of what a national law requires," with such an interpretation receiving "a respect proportional to its power to persuade") (citations and internal quotation marks omitted).

[27]    The Court pauses here to offer a pair of additional salient observations. First, in finding that the nationwide permit process excuses the Corps from expressly determining compliance with General Condition 7 before issuing verification, the Court expresses no opinions about what the law should be, only what it is. The Eleventh Circuit has previously stated that it is "acutely aware of Appellants' legitimate concerns over abuse of the general permitting process … [to] gut the individual permitting process." *Sierra Club v. U.S. Army Corps of Engineers*, 508 F.3d 1332, 1336 (11th Cir. 2007). If Baykeeper is correct, then there may be important unanswered questions about whether the law should impose on the Corps additional oversight and investigative duties before issuing verifications under nationwide (Continued)

### 3. The Public Interest.

Baykeeper's next set of claims is that "the Corps failed entirely to consider the public interest when it authorized the NWP 12 verifications to Plains." (Doc. 39, at 22.) The Corps Defendants take the diametrically opposing stance that "the Corps is not required to perform a public interest analysis in verifying that an activity qualifies for a nationwide permit." (Doc. 43, at 16.) Once again, then, the parties' dispute centers on what steps the Corps was required to take before issuing the January 2013 verifications to Plains Southcap.

In support of its position, Baykeeper identifies two authorities that it maintains obligated the Corps to perform such a public interest analysis antecedent to issuing verifications for the

---

permits; however, those questions are legislative or regulatory in nature, and are not properly before the judiciary in cases such as this. Second, the Court expressly declines the parties' invitations to issue an alternative holding as to whether General Condition 7 was or was not satisfied here, whether the pipeline's location would or would not pass the proximity test, or whether a General Condition 7 inquiry may take into account risk of oil spills. A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted). Here, the Corps never found that General Condition 7 was satisfied, that the pipeline would not result in "activity … in the proximity of a public water supply intake," or the like. The Court cannot rescue an agency action from arbitrary and capricious status by "filling in the gaps" to shore up deficiencies in the agency decision. In other words, if the Corps were required to consider General Condition 7, defendants could not escape remand by having this Court issue findings as to how it thinks the Corps should have decided a General Condition 7 inquiry had it performed same. The claims presented hinge on whether the Corps was required to consider General Condition 7 before issuing the verifications. If so, remand to the agency would be necessary, because the Corps' verification decisions would have been rendered arbitrary and capricious by the agency's failure to consider an important aspect of the problem. Upon remand, it would be the Corps' responsibility (not that of this Court) to apply General Condition 7 and make proximity findings. *See generally National Wildlife Federation v. Hanson*, 623 F. Supp. 1539, 1548 (E.D.N.C. 1985) ("The plaintiffs contend that, upon remand, the court should give the Corps specific instructions on how to properly proceed in making its wetlands determination. Although this court is empowered to review jurisdictional decisions to determine whether they are arbitrary or capricious, the ultimate responsibility rests with the Corps to employ its scientific expertise to develop an appropriate methodology."). Of course, the Court having concluded that the Corps was not bound to determine compliance with General Condition 7 before issuing NWP 12 verifications, those questions are moot. The Court will not engage in hypothesis and conjecture as to whether the Plains Southcap pipeline would have passed a "proximity" analysis under General Condition 7 had the Corps been required to perform one.

Plains Southcap pipeline. First, Baykeeper points to an excerpt from the Corps' Nationwide Permit 12 Decision Document dated February 13, 2012 (the "NWP 12 Decision Document"), in which the Corps wrote, "Division and district engineers can prohibit the use of this NWP in watersheds for public water supplies, if it is in the public interest to do so." (Doc. 43, Att. 1, at 32.) Second, Baykeeper cites General Condition 31 of the Corps' final rule entitled "Reissuance of Nationwide Permits" and dated February 21, 2012, which includes the following statement: "In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." 77 Fed. Reg. 10,287. The Court will examine each of these provisions in turn.

Without question, the NWP 12 Decision Document authorizes Corps officials at the division and district levels to "prohibit the use of this NWP in watersheds for public water supplies, if it is in the public interest to do so." However, this language cannot reasonably be construed as requiring district engineers to evaluate the public interest before verifying an activity under NWP 12. The Corps Defendants persuasively argue (with no rebuttal from Baykeeper) that the cited text does not relate to the verification process at all. After an NWP is issued by the Corps, each division or district engineer has discretionary authority to determine on a general level that the use of that NWP is inappropriate for particular geographic area or class of activities within that division or district, and to exclude its usage for that area or class of activities.[28] The Corps Defendants maintain that the cited language in the NWP 12 Decision Document was referring to this discretionary authority to prohibit use of a NWP generally in a class of activities or locations based on the public interest, rather than in singular verification decisions. Faced with this argument, Baykeeper has articulated no explanation for how the cited text might be read as applying to individual verification decisions. The Court will not attempt to formulate a litigant's unspoken arguments for it. More broadly, the lone sentence highlighted by

---

[28]     See 33 C.F.R. § 330.4(e)(1) ("A division engineer may assert discretionary authority by modifying, suspending, or revoking NWP authorizations for a specific geographic area, class of activity, or class of waters within his division, including on a statewide basis, whenever he determines sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if he otherwise determines that the NWP would result in more than minimal adverse environmental effects either individually or cumulatively.").

Baykeeper cannot reasonably be read as imposing an absolute duty on district engineers to perform a public interest analysis as a prerequisite to verifications in an individual case. The language in question speaks to what the Corps "can" do, without specifying what it must do. Thus, the cited text from the NWP 12 Decision Document does not lend credence to Baykeeper's position.

General Condition 31 is a different animal. It addresses individual verification decisions in circumstances where pre-construction notification ("PCN") is required, as in this case. It specifies that "[i]n reviewing the PCN for the proposed activity, the district engineer *will determine whether the activity* authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or *may be contrary to the public interest*." 77 Fed. Reg. 10,287 (emphasis added). As such, arguments that General Condition 31 does not apply at the individual verification stage or that it does not reference the public interest cannot be credited.

The Corps Defendants' response is twofold. First, they maintain that the Corps did comply with General Condition 31. (Doc. 43, at 17-18.)[29] In that regard, they point to the 7-page Decision Document (the "Verification Decision Document") issued by the Corps to Plains Southcap on January 17, 2013, granting the requested verifications under NWP 12. In the Verification Decision Document, the Corps describes the contemplated pipeline project, delineates the nature and locations of the stream crossings and wetlands impacts, examines effects under the Endangered Species Act and National Historic Preservation Act, recites 11 special conditions that Plains Southcap must satisfy and the rationale for each, and sets forth the compensatory mitigation that will be required. (AR 1005-11.) The Verification Decision Document concludes with the Corps Team Leader's "Determination," to-wit: "I have reviewed the proposed project and determined that the work will result in minimal individual and cumulative adverse effects on the aquatic environment." (AR 1011.) The Corps' position is that this Determination satisfies the General Condition 31 requirements touted by Baykeeper. Second, the Corps Defendants insist that it would contravene Congressional intent to construe

---

[29]     The Corps Defendants' assertion is as follows: "Baykeeper also relies on language in the Federal Register that the District Engineer will determine whether the project will result in more than minimal environmental impacts or may be contrary to the public interest. *The Corps did make such a determination in this case.*"  (Doc. 43, at 17 (emphasis added).)

General Condition 31 as mandating a full *de novo* public interest review for every verification request. (Doc. 43, at 17.)

After careful consideration of the parties' summary judgment arguments, the Court concludes that defendants have the upper hand on the "public interest" issue. A host of considerations inform this result. As an initial matter, plaintiff has not responded to or addressed the Corps Defendants' contention that the "Determination" at the end of the Verification Decision Document sufficed to fulfill the requirements of General Condition 31. If Baykeeper disagrees with the Corps' position, it was obliged to say so and to explain why in its reply/opposition brief (doc. 47). Instead, it remained silent on this point.

Furthermore, the Corps Defendants' position resonates because a dizzying array of factors are embedded in the notion of a public interest review. The NWP 12 Decision Document reflects the Corps' extensive public interest review in connection with issuing NWP 12, including 23 enumerated factors that the Corps considered and addressed in the Decision Document pursuant to 33 C.F.R. § 320.4(a)(1) & (2). (Doc. 43, Att. 1, at 28-35.)[30] Public

---

[30]     Those public interest factors include the following: conservation values, economics (impacts of utility line activities on local economy, job generation, and infrastructure), aesthetics (visual character, air quality, noise), general environmental concerns (pollution, effects on physical/chemical/biological characteristics of environment), wetlands (loss, alteration, restoration, compensatory mitigation), historic properties, fish and wildlife values (effects on habitat of fish and wildlife in affected streams, wetlands and other waters), flood hazards (whether project will affect surface water flow velocities and flood-holding capacity), floodplain values, land use (alteration in land use from natural to developed), navigation, shore erosion/accretion, recreation (effect of utility lines on activities such as bird watching, hunting and fishing), water supply and conservation (effects on surface water, groundwater, water pollution, local water supplies, and so on), water quality (increased sediments and pollutants in the water, effects on microorganisms in the water, riparian vegetation), energy needs (potential for utility line construction to induce higher rates of energy consumption by making energy products more readily available to consumers), safety, food and fiber production (reduction in available farmland, effects on commercial food production facilities), mineral needs (demand for materials used in constructing utility lines, including steel, aluminum and copper), considerations of property ownership (right to reasonable private use of property), relative extent of public and private need for the proposed project, practicability of reasonable alternative locations and methods for the project, and extent and permanence of the project's beneficial and detrimental effects on public and private uses of the area. (Doc. 43, Att. 1, at 28-35; 33 C.F.R. § 320.4(a)(1) & (2).) Plaintiff would apparently have the Corps pick out one of these factors ("water supply and conservation") and deem the project contrary to the public interest. In reality, public interest review entails a far more rigorous, searching inquiry.

interest review is a time-consuming, resource-intensive undertaking. Under Baykeeper's hypothesis that the Corps could not issue NWP 12 verifications for the Plains Southcap project without first determining whether that activity was contrary to the public interest, the Corps would be compelled to perform a staggering amount of work at the verification stage, such duties to include investigating, evaluating, collecting information on, and weighing these 23 public interest factors. This would increase exponentially the Corps' workload in connection with each verification request it receives. It would in many respects duplicate a public interest review already performed at the aggregate level in issuing NWP 12 in the first place. It would almost certainly necessitate the sort of activity-specific public hearings and notice-and-comment proceedings that the nationwide permit system was designed to avoid. It would collapse the carefully crafted regulatory distinction between individual permits, on the one hand, and verification of activities under nationwide permits, on the other, by requiring the Corps to perform the same public interest review functions in both circumstances. And it would run counter to the objective of streamlining administrative review under the nationwide permit process at the verification stage. *See Snoqualmie Valley*, 683 F.3d at 1163 ("The purpose of this scheme is to enable the Corps to quickly reach determinations regarding activities that will have minimal environmental impacts …. Requiring an elaborate analysis of the applicable regulations and the facts would defeat this purpose.").

Additionally, the Court considers the Corps' interpretation of its own General Condition 31 as being satisfied by a Determination couched in terms of "minimal individual and cumulative adverse effects on the aquatic environment," rather than whether the project is contrary to the public interest. Because the Corps is applying its own rule, its interpretation is entitled to deference. *See generally Sierra Club, Inc. v. Leavitt*, 488 F.3d at 912 ("courts must give deference to an agency's reasonable interpretation of its own regulations"). The Corps' interpretation is bolstered by the context surrounding the language touted by Baykeeper, to-wit: "In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." 77 Fed. Reg. 10,287. That section of the final rule goes on to provide guidance for the District Engineer in "making minimal effects determinations" and repeatedly uses the labels "minimal adverse effects determination" and "minimal adverse effects." *Id.* at 10,287-88, at §§ D.1.-3. Notably, however,

that section does not use the phrase "contrary to the public interest" or "public interest determination" again. Viewing the text of General Condition 31 as a whole, then, rather than simply plucking out and highlighting one sentence in isolation as Baykeeper has done,[31] the rule appears to be requiring a minimal adverse effects inquiry, rather than a separate, stand-alone, comprehensive public interest analysis. Thus, the context of the rule supports the Corps' interpretation of the sentence on which Baykeeper relies.

In sum, the Court does not read the applicable NWP 12 Decision Document and General Condition 31 as imposing an obligation on the Corps to conduct a public interest analysis prior to issuing a NWP 12 verification. To be sure, General Condition 31 specifies that "the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." However, the Corps Defendants have made an uncontradicted, unrebutted showing that they complied with this requirement with respect to the Plains Southcap verifications in January 2013. That showing is bolstered by the policy objectives underlying the nationwide permit process, the Corps' extensive public interest analysis before issuing NWP 12, the Corps' entitlement to deference for its interpretation of its own final rule, and the context of General Condition 31 itself. For these reasons, defendants will be granted summary judgment as to Baykeeper's claims that the Plains Southcap verifications were arbitrary and capricious because the Corps failed to consider whether the activity was contrary to the public interest.

### 4.     *Explanation for Finding of Minimal Cumulative Effects.*

Baykeeper's final set of claims challenging the Corps' verification decisions as to the Plains Southcap pipeline project again rely on General Condition 31, and specifically its requirement that the district engineer "will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects."

---

[31]     Of course, it is a time-honored principle of statutory construction (and therefore regulatory construction) that words and phrases must not be viewed in isolation; rather, the document as a whole must be considered. *See, e.g., Utility Air Regulatory Group v. E.P.A.*, --- U.S. ----, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (referencing the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citation omitted); *Poveda v. U.S. Atty. Gen.*, 692 F.3d 1168, 1179 (11th Cir. 2012) ("in construing a statute, we do not look at one word or term in isolation, but instead we look to the entire statutory context") (citation omitted).

77 Fed. Reg. 10,287.  Here, the Corps unquestionably made such a determination.  At the conclusion of the Verification Decision Letter, the Corps' Team Leader wrote, "I have reviewed the proposed project and determined that the work will result in minimal individual and cumulative adverse effects on the aquatic environment."  (AR 1011.)  Baykeeper's challenge is not that the Corps failed to make the minimal adverse effects determination required by General Condition 31; instead, Baykeeper seeks to have the Corps' decision overturned as arbitrary and capricious because "it failed to provide a reasoned explanation for its determination that the Pipeline will result in minimal individual and cumulative adverse effects."  (Doc. 39, at 24.)  In Baykeeper's view, the Corps' action was arbitrary and capricious because "[i]t is impossible to determine from the Record if the Corps analyzed this issue in a reasonable way."  (Doc. 47, at 4.)

It is an uncontroversial and correct statement of law that agencies typically must articulate a reasoned explanation for their decisions.[32]  Nonetheless, there are no hard and fast rules as to how much information the Corps must include or how detailed its explanation must be.  As both the Corps Defendants and Plains Southcap point out, "there is no statutory or regulatory dictate outlining the requirements of a verification letter, and the Court may not substitute its judgment for that of the agency."  *Sierra Club, Inc. v. Bostick*, 2013 WL 6858685, *24 (W.D. Okla. Dec. 30, 2013); *see also Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp.2d 9, 21 (D.D.C. 2013) (rejecting plaintiff's argument that verification letters must include statement regarding cumulative impacts of stream crossings under NWP 12, and observing that "there is no statutory or regulatory mandate that verification letters contain any such statement"); *Sierra Club v. United States Army Corps of Engineers*, --- F. Supp.2d ----, 2014 WL 4066256, *19 (D.D.C. Aug. 18, 2014) (opining that "Plaintiffs have not convinced this Court that the CWA or NWP 12 requires anything more" than a statement in each verification

---

[32]    *See, e.g., Conservancy of Southwest Florida v. U.S. Fish & Wildlife Service*, 677 F.3d 1073, 1077 n.9 (11th Cir. 2012) ("The APA's arbitrary-and-capricious standard requires the agency to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (citations and internal quotation marks omitted); *Sierra Club v. Martin*, 168 F.3d 1, 15 (11th Cir. 1999) ("Agency actions must be reversed as arbitrary and capricious when the agency fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (citation and internal quotation marks omitted).

letter to the effect that the proposed activity would result in only minor individual and cumulative adverse effects). What is left is the general Administrative Procedure Act requirement that the agency's explanation must provide "a rational connection between the facts found and the choice made." *Sierra Club v. Martin*, 168 F.3d 1, 15 (11th Cir. 1999) (citation omitted). That requirement becomes the legal battleground for Baykeeper's claims.

A survey of recent case law reveals that arguments like Baykeeper's (*i.e.*, that the Corps must provide a full explanation of its minimal effects determination in verification letters or otherwise under NWP 12) have not fared well. Most recently, a federal district court in the District of Columbia considered a claim similar to Baykeeper's assertion that the verification letters lacked sufficient information to justify their stated determinations. *See Sierra Club*, 2014 WL 4066256, at *20. The court found that the Corps' minimal effects determinations set forth in the verification letters were not arbitrary and capricious because each such determination "was made at the end of a lengthy memorandum explaining … the details concerning the scope of the proposed project …, the expected effect of the project on waters of the United States within that district, and specific mitigation techniques to be employed in response to those effects …. [T]his Court has little trouble finding that there was a factual basis in the evidentiary record for the district engineers to reach the conclusions they did regarding the cumulative effects of the portions of the pipeline planned for construction in their district." *Id.*[33]

The case at bar is analogous to the recent District of Columbia *Sierra Club* decision. The Corps' Verification Decision Document issued to Plains Southcap is a seven-page, single-spaced document that outlines the parameters of the proposed pipeline; describes the pipeline's expected effects as including temporary trenching of 22 stream crossings, impacting 389 linear feet of stream bottoms, with temporary trenching and side-casting of fill, and temporary and permanent

---

[33]    Other recent cases are comparable. *See Sierra Club v. Bostick*, 2013 WL 6858685, at *24 (rejecting plaintiff's challenge to sufficiency of Corps' minimal effects determination because "[t]he verification letters identified the appropriate criteria and determined they were met"); *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp.2d at 21 (denying plaintiff's claim that Corps verification was arbitrary and capricious where verification letters did not include cumulative effects discussion, and reasoning that "the Court will not assume that the fact that the verification letters lack a statement regarding cumulative effects means that the Corps failed to perform such an analysis, particularly where NWP 12 directs the district engineers to do so").

conversion of 40.42 acres of bottomland hardwood wetlands; identifies the specific bodies of water and wetland locations impacted by the project; and recites findings as to adverse effects under the Endangered Species Act and National Historic Preservation Act. (AR 1005-07.) The Verification Decision Document also rattles off a series of special conditions, including temporal limits and other restrictions on side cast of material from trench excavation into waters of the United States; requirements that Plains Southcap purchase 25.92 bottomland hardwood wetland mitigation credits to prevent a net loss of wetland functions; mandates that Plains Southcap restore all temporary impacts of waters to pre-impact elevation, contours, and ecological condition except as noted; directives as to the manner in which excavation and fill activities shall be performed; limits on disposal of vegetative debris or discharge of oil or other pollutants into the watercourse; restrictions on movement of equipment within wetlands; and so on. (AR 1007-10.) If the verification letters in the District of Columbia case offered sufficient factual basis for the Corps' minimal effects determination therein (and that court specifically found that they did), then the same conclusion must attach here as well.

Baykeeper does not articulate why it contends the information and analysis in the Verification Decision Document (and, indeed, in the 1,000+ page administrative record) is insufficient to fulfill the Corps' duty to explain its minimal effects determination. Apparently, Baykeeper would discount everything in the Verification Decision Document that is not explicitly couched as a cumulative effects analysis. (Doc. 39, at 24-25.) The Court is aware of no legal authority or rationale, and plaintiff has provided none, mandating that the Corps' discussion of underlying cumulative effects be summarily jettisoned if it does not bear the label "cumulative effects analysis." The point is simple: The extensive, detailed information set forth in the Verification Decision Document adequately supports the Corps' minimal effects determination at the conclusion of that document. Plaintiff has not shown that any statute or regulation obligated the Corps to say anything more to justify its decision.

The marshaled legal principles that disfavor Baykeeper's argument include additional considerations, as well. Forcing the Corps to write up a separate, detailed "cumulative effects analysis" in the verification process would undermine the purposes of the nationwide permitting process as outlined in *Snoqualmie Valley*. Moreover, the Corps' interpretation of its final rule is entitled to deference. As a general proposition, such deference applies with equal force to drafting decisions, such as the Corps' determination of how much or how little analysis to

include on a topic.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008) (arbitrary and capricious standard of review "requires substantial deference to the agency … when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue").  This Court will not second-guess the Corps' degree of discussion of the minimal effects determination merely because the agency did not label it in a particular way.

Considering all of these factors in the aggregate, the Court readily concludes that the Corps' justification of its minimal impacts determination is not so threadbare that the verification decisions were thereby rendered arbitrary and capricious.  The Corps has articulated a satisfactory explanation for its minimal impacts determination, including a rational connection between the facts found and the choice made.  For that reason, remand to the Corps is neither necessary nor appropriate to require the agency to explain why it did what it did.

V.    **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.     Plaintiff's claims are **moot in part**, to the extent that plaintiff seeks declaratory or injunctive relief as to stream crossings ultimately achieved through horizontal directional drilling methods, because such activities are outside the regulatory purview of the Corps of Engineers and the Court could not grant plaintiff effective relief with respect to same;

2.     Plaintiff's Motion for Summary Judgment (doc. 38) is **denied**;

3.     The Corps Defendants' Cross-Motion for Summary Judgment (doc. 43) and Plains Southcap's Motion for Summary Judgment (doc. 45) are both **granted**;

4.     There being no genuine issues of material fact, plaintiff's Complaint is **dismissed with prejudice**; and

5.     A separate judgment will enter.

DONE and ORDERED this 16th day of October, 2014.

s/ WILLIAM H. STEELE

CHIEF UNITED STATES DISTRICT JUDGE